Harbor Holding Company of Nevada (a Dissolved Corporation), A. S. Henderson, Roger Foley, and Louise Graham, as Liquidating Trustees, et al. v. Commissioner.
Harbor Holding Co. v. Commissioner
Docket Nos. 106028, 106027, 106029, 106030, 106031. *
United States Tax Court
1942 Tax Ct. Memo LEXIS 91; 1 T.C.M. (CCH) 59; T.C.M. (RIA) 42588; November 10, 1942
*91 J. D. Brady, Esq., 433 S. Spring St., Los Angeles, Calif., for the petitioners, E. A. Tonjes, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, J.: The respondent has determined a deficiency in income for the year 1938, in the amount of $17,202.70. The deficiency results from a determination that the assets of the Harbor Holding Company of Nevada, a dissolved corporation, were sold by its stockholders on behalf of petitioner, so that the sale of assets was a sale by petitioner, and petitioner realized a profit of $120,923. [1] The question is whether certain assets were sold by petitioner's stockholders for their own respective accounts, or were sold on behalf of and for the account of petitioner. Each petitioner in Docket Nos. 106027 and 106029 - 106031, inclusive, agrees that he is a transferee and liable for the petitioner's deficiency in the event the main question should be decided in respondent's favor, such admission being without prejudice and only for purposes of appeal. *92 Findings of Fact The Harbor Holding Company of Nevada is a Nevada corporation which was organized on May 25, 1925, under the laws of the State of Nevada. Under its articles of incorporation it had perpetual existence. The Harbor Holding Company of Nevada is referred to hereinafter as the petitioner. Petitioner's office was located at Las Vegas, Nevada. The petitioner filed its income tax return for the year 1938 with the collector for the district of Nevada. During the taxable year, and prior thereto, the officers and directors of petitioner were as follows: A. S. Henderson, president and director; Louise Graham, secretary and director; Roger Foley, director. The total number of shares of capital stock of petitioner outstanding in 1938 was 2,000 shares. Each share of capital stock was entitled to one vote. In December of 1938, and prior, the petitioner's stockholders were as follows: Stockholders
Address
No. of Shares
L. S. Anderson
San Pedro, Calif
292.2
L. S. Anderson and L. P. Anderson, Joint Tenants
San Pedro, Calif
32. B. Bell and M. Bell, Joint Tenants
San Pedro, Calif
394.2
W. L. Davenport
San Pedro, Calif
394.2
T. J. Evans
San Pedro, Calif
378.2
R. C. Goodspeed
Los Angeles, Calif
411.2
C. W. Bonynge and J. Bonynge, Joint Tenants
Los Angeles, Calif
17. Leta Bonynge
Los Angeles, Calif
17. Mary E. Johnson
Los Angeles, Calif
10. L. R. Tuttle and M. I. Tuttle
Los Angeles, Calif
7. Harry Schulz
Long Beach, Calif
20. Alice E. Johnson
Balboa, Canal Zone
10. Gypsy Blackstone
San Pedro, Calif
8. Kenneth E. Bell
San Pedro, Calif
2. C. P. Wright
San Pedro, Calif
2. R. M. Cordill
San Francisco, Calif
2. G. M. Hart
St. Louis, Mo
2. Juanita Knippenberg
Compton, Calif
1. Total
2,000. *93 The Andersons, the Bells, Davenport, Evans, and Goodspeed held the majority of the stock of petitioner, and their total holdings aggregated 1,902 shares. Petitioner was a holding company. It was organized for the purpose of holding a block of stock of the Van Camp Sea Food Company, which conducted a fish packing business and had its chief office in San Pedro, California. During the entire period of petitioner's existence, its business consisted solely of holding the Van Camp stock and receiving dividends on the stock which it distributed to its stockholders from time to time. At one time the Van Camp stock was owned by the First National Bank of San Pedro which had acquired the stock as collateral to loans. Petitioner was organized by the First National Bank of San Pedro for the purpose of holding the Van Camp stock for the bank's convenience. After petitioner was organized, certain stockholders of the bank, or former stockholders, purchased the Harbor Holding Company stock from the bank. At all times during the petitioner's existence, it owned the following stock of the Van Camp Sea Food Company: Prior Preferred Stock
Cert. #152
402 shares
Prior Preferred Stock
Cert. #259
51 shares
453 shares
Preferred Stock
Cert. #46
395 shares
Common Stock
Cert. #68
286 shares
*94 Certain of petitioner's stockholders owned, individualy, some of the preferred stock of the Van Camp Company as follows: R. C. Goodspeed, B. Bell and M. Bell, W. L. Davenport, T. J. Evans, L. S. Anderson and L. P. Anderson, each individually owning 5 1/5 shares of the Van Camp preferred stock, total 26 shares. Another stockholder of the Van Camp Company was Mrs. Maude C. Reynolds, who owned 440 shares of prior preferred stock, 91 shares of preferred stock, and 996 shares of common stock. The total number of shares held by Mrs. Reynolds, all classes, was 1,527 shares. The total number of shares of Van Camp stock of all classes owned by petitioner was 1,134 shares. Petitioner, Mrs. Reynolds, and certain of petitioner's stockholders, named above, were minority stockholders of the Van Camp Company. The total outstanding stock in 1938 of the Van Camp Sea Food Company was as follows: prior preferred stock, 5,739 shares; preferred stock, 5,985 shares; common stock, 8,000 shares. The total outstanding stock of the Van Camp Company, all classes, was 19,724 shares. In 1934 Katharine Mahar and others, former stockholders of the First National Bank of San Pedro, instituted a law suit against *95 R. C. Goodspeed, L. S. Anderson, G. Roy Pendell, petitioner, and others, to impress a trust on the Van Camp stock which had been acquired by petitioner, to require an accounting, and to recover damages for fraud. It appears that the plaintiffs in that proceeding had at one time been given the opportunity to acquire stock in Harbor Holding Company, but had not accepted the offer and, later, when the business of the Van Camp Company became prosperous, they decided they had been defrauded sometime between 1924 and 1927. This proceeding is hereinafter referred to as the Mahar case. The petitioner was dismissed as a party defendant in the Mahar case in 1935, and thereafter it was not a party in that law suit. However, Goodspeed and Anderson, in particular, remained parties defendant at all times until the final determination in the Mahar case. The trial court entered a judgment for the defendants in the Mahar case, from which an appeal was taken to the District Court of Appeals, First District, which appeal was pending during the year 1938. R. C. Goodspeed is an attorney admitted to practice in California. He had offices in Los Angeles. He had been closely associated *96 with the First National Bank of San Pedro. He knew well the former stockholders of that bank, and most, if not all, of petitioner's stockholders. From time to time he acted as petitioner's attorney. For many years prior to 1938 he had been the confidential attorney for a great many of petitioner's stockholders, and they were accustomed to following his advice. In the early part of 1938, or prior, Anderson, as a stockholder of the Van Camp Company, instituted a suit in the interest of all stockholders of the corporation against Gilbert C. Van Camp, as executor of the estate of Frank Van Camp, deceased, Van Camp Sea Food Company, and others, including Montgomery Phister, W. H. Gillis, S. Pickering, Roy Harper, and Harry C. Ward. This was a representative and derivative suit. Anderson did not act for himself alone, but acted for the interest of all of the stockholders of the corporation. Mrs. Maude C. Reynolds was interested in the prosecution of the suit as a stockholder of the Van Camp Company. In the complaint, Anderson, plaintiff, was said to be a stockholder in the Van Camp Company as an owner of 5 1/5 shares of preferred stock. The complaint alleged, inter alia, that a group *97 of named individuals had purchased a controlling interest in the stock and management of the Van Camp Company and had installed their own board of directors; that they had entered into a conspiracy among themselves to divert and appropriate the funds and assets of the Van Camp Company to their own personal uses and for their own advantage to deprive the corporation and the stockholders of all of the earnings and profits, and to force the stockholders to surrender to the named group their shares of stock for an inadequate consideration. The complaint prayed for an accounting to the corporation, for the appointment of a receiver, and for injunctive and equitable relief on behalf of the corporation. In the complaint the defendants were referred to as "conspiring defendants." It was also prayed that the "conspiring defendants" be enjoined and restrained from paying out any funds and assets of the Van Camp Company, until a final determination of the suit. In connection with the Anderson case, and at the same time that the complaint in that suit was filed, L. S. Anderson filed a creditor's claim in behalf of the Van Camp Company and for the benefit of its stockholders against the Estate *98 of Frank Van Camp, deceased, wherein a claim against the estate was made for $1,000,000 on the ground that the estate was indebted to the corporation in that amount. Attorneys for Anderson were the firms of Mayock & Lester, and Goodspeed, McGuire, Harris & Pfaff. Welburn Mayock, attorney, a member of the Mayock firm, represented Mrs. Reynolds. Anderson was only a nominal plaintiff in a representative capacity, and Mayock represented him only indirectly. The Goodspeed law firm represented other of the Van Camp stockholders. Goodspeed, a member of the Goodspeed firm, consulted with and worked with Mayock in the suit. The law suit instituted by Anderson is hereinafter referred to as the Anderson case. The Anderson case was pending in 1938 in the Superior Court of the State of California. The defendants in the Anderson case were represented by the Los Angeles law firm of O'Melveny, Tuller, 4 Myers, of which Pierce Works was a member. One of the defendants, Montgomery Phister, was an attorney as well as an officer of the Van Camp Company. After the complaint in the Anderson case was filed, Mayock and Works met and discussed the possibilities of working out a settlement *99 of the suit. The conversations, began sometime in May of 1938. A suggestion was made by Works and Phister that perhaps the best way to settle the suit would be for some of the defendants in the Anderson suit to purchase the stock of the dissatisfied stockholders who were represented by Anderson as plaintiff in the Anderson suit. Goodspeed, a defendant in the Mahar case, and a stockholder in the Van Camp Company, owning 5 1/5 shares, was unwilling to consider any settlement of the Anderson case unless the Mahar case was satisfactorily disposed of. Goodspeed believed that the Mahar case had been fomented and financed by the Van Camp interests, and he believed that some agreement involving the settlement of the Mahar case was a prerequisite to a settlement of the Anderson case. Goodspeed was consulted from time to time both as to the interest of petitioner in the Anderson suit and as to his own interest in the suit as a stockholder in the Van Camp Company. Mrs. Reynolds had no interest in the Mahar suit. The dissident stockholders represented by Anderson in the Anderson suit whose stock Phister believed should be acquired by himself *100 and other closely associated with the Van Camp Company, were Mrs. Reynolds, Anderson, Goodspeed, Davenport, Evans, the Bells, and petitioner. The total Van Camp stock, all classes, held by the above was 2,687 shares. Phister would not agree to any settlement of the Anderson case unless all of the above stock could be acquired by his group, because he wished to eliminate the possibility that any one stockholder might continue the Anderson case or institute similar proceedings against the Van Camp Company's management. The proposed acquisition of the petitioner's Van Camp stock presented a problem at the beginning of the discussions which persisted throughout. Goodspeed suggested that the Phister group purchase all of the outstanding stock of petitioner as a means of acquiring the Van Camp stock owned by petitioner. Phister objected to such procedure on the ground that he did not know what liabilities of petitioner, a corporation, might be acquired. He adhered to that objection. Goodspeed, as one of petitioner's stockholders and as attorney for petitioner, objected to a sale by petitioner of its Van Camp stock because such sale would result in a gain to petitioner upon which *101 income tax would amount to above $17,000. The remaining possibility was for petitioner to liquidate and distribute the Van Camp stock as a liquidating dividend to its stockholders of which there were about eighteen. If that course were followed, Phister would then have to arrange to acquire the Van Camp stock from the 18 distributees of petitioner. That course was cumbersome because of Phister's requirement that every share of the 2,687 shares involved must be acquired by his group as a condition precedent to any agreement by the Van Camp group to a settlement of the Anderson case. Even so, Goodspeed adhered to his view that a settlement of the Anderson case could not be worked out which involved a sale by petitioner of its Van Camp stock. His reasons were that he believed that the tentative offered prices which had been discussed were insufficient in the first place, and, further, that if the tentative prices offered were the highest, then at such prices, he did not consider it "good business" for petitioner to sell for such prices and acquire a tax bill of $17,000 in the bargain. As late as October 20, 1938, Goodspeed still urged that the Phister group consider the simpler *102 method of purchasing petitioner's capital stock. The discussions between Works and Mayock continued through June, July, August, October, and November of 1938. At no time was any offer made to petitioner by the Phister group to purchase its Van Camp stock. It was understood, evidently, by Works, Phister, and Mayock that Goodspeed's strong opposition to a sale by petitioner of its Van Camp stock stood in the way of working out any settlement and the acquisition of the block of stock held by petitioner as well as acquisition of Goodspeed's stock. The situation was such that one person could block the entire negotiation by refusing to enter into it and Goodspeed was in that position. He was the largest stockholder in petitioner. He had evidenced dissatisfaction with the Van Camp management as was shown by his letter of August 5, 1938 (Respondent's Exhibit A-7), when he wrote to Mayock that "there is still plenty of 'monkeybusiness' still going on," referring to matters in the internal management of the Van Camp Company which he was investigating. In August of 1938 Goodspeed wrote to Henderson, petitioner's president, advising him that a distribution in liquidation of the Van Camp stock *103 should be considered and requesting his advice about the time required to effect a liquidation of petitioner. By October 25, 1938, it was understood by Mayock and Works that considerations as of that date involved the proposed acquisition by the Phister group of the Van Camp stock of Mrs. Reynolds and the Van Camp stock "owned by the liquidation beneficiaries of the Harbor Holding Company." (Respondent's Exhibit A-14). Works understood that the sale of Van Camp stock contemplated would be by persons other than petitioner. Phister and his group on or before December 16, 1938, understood that petitioner would distribute its Van Camp stock to its stockholders and that they would sell their stock to him, if at all. On or about October 25, 1938, Mayock and Works had developed a plan for the settlement of the Anderson suit the broad aspects of which had the approval of the Phister group, on the one side, and Mrs. Reynolds and Goodspeed, representing all others interested in the prosecution of the Anderson case, on the other side, the details of which, however, continue to be the subject of further discussion through November and into December. The main outline of the plan was that *104 Phister and others would pay $108 per share, plus $8 accrued dividends, for prior preferred stock; $142 per share for preferred stock; $50.50 per share for common stock; and submit their signed agreement to a dismissal of the Mahar case with a remittitur in exchange for all of such stock held by those interested in prosecuting the Anderson case, a signed agreement to dismiss the Anderson case and an approval by the court of dismissal of the case, and releases signed by the dissident Van Camp stockholders. The Phister group was to pay for the Van Camp stock in cash and notes, an amount of cash to be paid at the closing, and the balance to be paid by 5 serial notes bearing 5 percent interest payable each year after 1938, the last being due February 1, 1943. Also, the Phister group was to place everything that they offered in escrow with the Bank of America to be delivered out of escrow only upon compliance with all of their conditions as set forth in their escrow instructions. Later, in December, Goodspeed insisted that his clients should be paid dividends on the prior preferred stock up to the date of the escrow, and Phister agreed on December 14, 1938, that he would *105 provide an additional $2,600 for such accrued dividends. Goodspeed and Mayock, on one side, and Works, on the other, as attorneys, understood that the above would be the terms of a contract, if one was made. During November and early December Mayock and Works discussed details and preparatory matters in general. Goodspeed's firm represented Anderson in the Anderson suit. Goodspeed, personally, as a defendant, was interested in the settlement of the Mahar suit. Goodspeed had been the attorney for many years for Anderson, Evans, Davenport, Wright, and Blackstone, and he knew, personally, the Bells, and had worked with them on matters relating to the First National Bank of San Pedro. All of the above persons were stockholders in petitioner. As individual clients of Goodspeed they had followed his advice in the past. Goodspeed was the most active stockholder in petitioner from the standpoint of time spent in taking interest in its affairs, as well as the largest stockholder. His interest in the settlement of the Anderson suit was largely personal. During all the time that he was consulted by Works and Mayock, Goodspeed did not at any time tell them that he was authorized *106 by the officers of petitioner to negotiate with them for a sale by petitioner of its block of Van Camp stock. Goodspeed had ascertained as early as August 5, 1938, that a sale of the Van Camp stock by petitioner would entail a tax of about $17,000 on petitioner, and he had so advised Mayock by a letter bearing that date. At that time, also, he had made it clear that it was his own view that the Van Camp stock held by petitioner could be acquired only by either a purchase of all of petitioner's capital stock by the Phister group, or a purchase from the liquidating distributees of petitioner after petitioner had made a distribution of its assets, consisting of the Van Camp stock. In October and before, Goodspeed had been told that the Phister group would not consider purchasing all of petitioner's capital stock and it was clear to him that if any settlement were worked out a liquidation of petitioner would be involved. He did not wish to present any of the projected plan to petitioner's stockholders, some of which resided outside California, until a plan had been perfected to a degree that he personally approved. It was not until the middle of December that he personally approved the *107 details of the plan which had been under the consideration of Works, Mayock, and himself. When so satisfied, Goodspeed, on December 16, 1938, wrote a five-page letter to all of petitioner's stockholders on a letterhead of his firm fully outlining to them the entire situation. He prefaced the letter by calling attention to the fact that his firm was the legal counsel for petitioner. The gist of Goodspeed's letter to petitioner's stockholders was as follows: after referring to the litigation which had been pending involving petitioner's Van Camp stock holdings and the costliness thereof, it was stated that as a result of negotiations which had been in progress, it had become possible both to dissolve petitioner and to enable petitioner's stockholders to dispose of the assets which they would receive upon liquidation, but that part of the purchase price which could be collected for the distributees out of their disposition of their liquidating dividend would be on a deferred payment plan extending over about five years; that upon dissolution of petitioner with a complete distribution of its assets in liquidation, the distributees would receive such assets subject to all liabilities *108 and obligations of the corporation which consisted of costs of defending and maintaining various litigation which would have to be discontinued and settled. [2] The letter pointed out that the stockholders of petitioner would have to arrange to discharge all tax and other obligations of petitioner whether arising before or after dissolution. The letter stated, in part, as follows: * * * * *
We have accordingly advised the corporation that it would be preferable to have its corporate existence terminated at this time, and to distribute its assets among its stockholders forthwith and thereby enable the stockholders as individuals to proceed, directly or through their own representative, to enter into such sale transaction as they may deem best and to so compromise or dispose of all pending litigation in such manner as may be found possible and advisable. The sale opportunity now under consideration is very substantially better than any known previous transaction, yet it is not sufficiently good to satisfy the officers of the company that the corporation should make such a sale at this time and thereby incur the very heavy tax obligation that would result. It is the opinion of the *109 tax consultant of the corporation, in which we concur, that there would probably be very little tax obligation on the part of the corporation, if a complete dissolution and liquidation occurs during the current calendar year. without its consummating any such sale, and that any sale made by the stockholders themselves of the proceeds of liquidation would not involve the corporation in any income tax liability. * * * * *
It is our suggestion that this situation may be met, the present sale opportunity availed of by the stockholders and each individual stockholder protected from having at any time to sustain [sic] or pay more than his or her proportionate share of the burden and expense, through the following plan: (1) Each stockholder to sign and send by registered mail to the corporation at its home office, P.O. Box 148. Las Vegas, Nevada, the enclosed form of "Consent to Dissolution," accompanied by their certificates of stock in the corporation, duly endorsed in blank, or to A. S. Henderson, President of the corporation, to be cancelled in case of dissolution of the corporation during the current month, otherwise to be returned to the stockholders. (2) Each stockholder *110 to sign and acknowledge, in duplicale originals, the enclosed Power of Attorney to L. S. Anderson (the nominal plaintiff in the pending suit against the management of Van Camp Sea Food Co., Inc., to compel restoration of various funds and assets to that corporation) irrevocably authorizing Mr. Anderson to receipt for, to endorse and to sell, as stockholders' agent, to Messrs. W. J. Grinnan et als., any and all of the Van Camp securities that may be distributed to the stockholders on the dissolution of Harbor Holding Company of Nevada, at not less than the following prices: par plus all accrued dividends on prior preferred stock, $142.00 per share for preferred stock, and $50.50 per share for common stock, payment therefor to be in the form of all cash for said prior [sic] preferred stock, $60.00 cash on preferred stock and $15.00 cash on common stock, and the balance to be represented by joint and several notes of Gilbert C. Van Camp and Roy P. Harper, payable to L. S. Anderson, or order, in five equal installments due on or before February 1, 1939, February 1, 1940, February 1, 1941, February 1, 1942 and February 1, 1943, with interest at five percent per annum; also authorizing *111 and directing Mr. Anderson, immediately on such sale, to pay over to the former stockholders of Harbor Holding Company of Nevada $20.00 per share out of the purchase price so received and the balance, together with any and all other assets received on dissolution of Harbor Holding Company of Nevada, (including all said Van Camp securities themselves, should said proposed sale for any reason fall of accomplishment during the current month) to be turned over to A. S. Henderson, of Las Vegas, Nevada, as trustee, as per Trust Agreement enclosed, less the amount of any debts and expenses of the corporation that may be paid by Mr. Anderson, with the written approval of Mr. Henderson. (3) Each stockholder to sign, in duplicate originals, the Trust Agreement enclosed, for their mutual protection, and for the protection of the officers, directors, and trustees in liquidation of Harbor Holding Company of Nevada, to make sure that all present debts and obligations of the corporation are met and satisfied, and none thereof permitted to fall unduly on any one or more of the stockholders, to collect the said notes and not only to carry out all obligations arising out of the dissolution of *112 the corporation, but, in case of present failure of the proposed sale, to complete such other sale of said assets distributed to the stockholders as said trustee may deem for your best interest, in the manner therein indicated. This present opportunity is open only subject to its being possible to consummate the entire transaction during this current month of December, and it is also highly desirable on the part of the sellers to so complete it, in order that the Holding Company may not become involved in the necessity of further tax liabilities and reports for the annual period beginning January 1, 1939. It is necessary in fact, in order to effectuate this present transaction, to have all details completed on or before December 24, 1938. * * * * *
While the writer is one of the larger stockholders of the Harbor Holding Company of Nevada, it is hardly necessary to say that no member of this office will personally profit from any such proposed sale of your stock interests in the corporation, or under the trust, otherwise than on a proportionate basis. Yours very truly, GOODSPEED, McGUIRE, HARRIS & PFAFF By The letter stated, also, that the: * * * whole plan of procedure, including *113 the dissolution of the corporation, the proposed sale transaction and the plan of trusteeship, has been carefully considered by all of the large stockholders of the corporation and has their complete approval. Goodspeed believed that petitioner's stockholders should be asked to give powers of attorney to some one individual, because of the number of petitioner's stockholders and to facilitate expeditious action; and, that a trust agreement should be entered into by all of petitioner's stockholders so that their respective interests could be co-ordinated and protected whether or not the proposed sale to the Phister *114 group was consummated, and so that, if the sales were made, the former stockholders of petitioner would share, in proportionate amounts, the unpaid obligations of petitioner which they would assume upon dissolution of petitioner. Goodspeed executed the trust agreement on December 24, 1938. He did not execute a power of attorney because he acted for himself. All of petitioner's stockholders executed the trust agreement and powers of attorney, naming Anderson as attorney-in-fact, on various dates from December 19, 1938, to December 24, 1938, except Mary E. Johnson, ber 27, 1938, and Leta Boynege and C.W. and J. Bonynge who executed the powers of attorney on December 30, 1938, and the trust agreement on December 31, 1938. Henderson accepted the trust, noting his acceptance on the executed duplicate originals on December 24, 1938, for the majority, and on December 28, 1938, for a few, and on December 31, 1938, for the Bonynges. On or before December 24, 1938, the trust agreement had been entered into and the powers of attorney had been signed by individuals owning 1,956 shares of petitioner's capital stock. On or before December 31, 1938, the individuals owning the remaining 44 shares *115 of petitioner's capital stock did likewise. Also, on or before December 24, 1938, 9/10ths of petitioner's stockholders owning 9/10ths of the voting power had executed consents to petitioner's dissolution. Individuals owning 1,944 shares of petitioner's stock had executed such consents. On December 16, 1938, several escrow instructions covering various matters were executed by Van Camp Sea Food Company, Inc.; W. J. Grinnan, W. H. Gillis, S. Pickering, L. F. Brown, and M. Phister; and Van Camp Sea Food Company, Roy P. Harper, and Gilbert C. Van Camp. These instructions were placed in escrow with the Bank of America in Los Angeles, as escrow agent, on or before December 24, 1938. On December 24, 1938, Phister executed a supplemental escrow instruction. All instructions stated that the persons signatory would deliver to the escrow agent, on or before December 24, 1938, various amounts of cash or certified checks, promissory notes for stated amounts, and various papers relating to the settlement of the Mahar case. Under the terms of these escrow instructions, the escrow agent was directed to hold all moneys, notes, and documents deposited in escrow until December 30, 1938, or such *116 time prior to said date when the escrow agent should be able to comply with all of the escrow instructions. The escrow instructions required the escrow agent to receive and hold for delivery to Van Camp Company, Phister, and all the others above named, dismissal of the Anderson suit, releases executed by Mrs. Reynolds and Anderson, Copy of a court order approving the settlement and dismissal of the Anderson suit, the 1,527 shares of Van Camp stock owned by Mrs. Reynolds, the 26 shares of preferred Van Camp stock owned by Goodspeed, Davenport, Evans, the Andersons and the Bells, and the 1,134 shares of Van Camp stock of various classes which stood in petitioner's name on December 24, 1938. The instructions were modified on December 30, 1938, to refer specifically to Van Camp stock of various classes standing in the names, on that date, of all of the former stockholders of petitioner with the exception of C.W. and J. Bonynge and Leta Bonynge. Upon compliance with the escrow instructions, the escrow agent was authorized to deliver to Mrs. Reynolds cash in a certain amount and five notes in fixed amounts, to L. S. Anderson, individually, notes and cash, and to the Goodspeed firm, *117 the documents covering settlement of the Mahar case. On December 24, 1938, a special meeting of petitioner's directors was held in Las Vegas, Nevada. Under Nevada laws a corporation may be dissolved upon filing with the Secretary of State consents of dissolution executed by 9/10ths of the voting power. At the meeting, Goodspeed presented consents of dissolution executed by 9/10ths of petitioner's stockholders stating that it was their desire to dissolve petitioner. The directors adopted a resolution to dissolve, authorizing the executive officers, subject to the approval of the liquidating trustees, to distribute all of petitioner's assets to the stockholders in complete liquidation and in complete retirement and cancellation of petitioner's capital stock. The distribution was to be made as soon as possible after the issuance of a certificate of dissolution by the Secretary of State. On December 27, 1938, a certificate of dissolution was issued by the Secretary of State of Nevada. Under Nevada laws the directors of a corporation at the date of dissolution automatically become the liquidating trustees. Accordingly, upon the dissolution of petitioner, its liquidating trustees *118 were Henderson, Foley, and Graham. On December 27, 1938, a meeting was held of petitioner's liquidating trustees. They approved the payment of a few small obligations after which petitiiner's balance of cash was $1,908.11. Payment of that amount to the Goodspeed firm for credit on account of the total amount due by petitioner for legal services in excess of $10,000 was authorized. The only asset remaining was the Van Camp stock. It being understood that petitioner's stockholders assumed liability for the payment of petitioner's outstanding obligations, the liquidating trustees adopted a resolution to distribute the Van Camp stock in liquidation to the stockholders proportionately. On December 28, 1938, certificates for all of petitioner's outstanding capital stock were surrendered and were cancelled with the exception of petitioner's stock held by Leta Bonynge and C.W. and J. Bonynge. On December 28, 1938, assignments of the Van Camp stock, the various classes, to each individual stockholder of petitioner, in proportion to his interest, was executed by the officers of petitioner, a dissolved corporation, and by the liquidating trustees. Henderson gave the assignments to Goodspeed, *119 together with the Van Camp stock certificates in petitioner's name and instructed him to surrender them to the Van Camp Company, to obtain new certificates, and to deliver them to the named individual assignees. On December 28, 1938, and December 29, 1938, the Van Camp Company issued new certificates in the names of the stockholders of petitioner, as follows: Van Camp Stock Issued to Stockholders of Harbor Holding Co., on 12/28/38 and 12/29/38 Prior Preferred
Preferred
Stockholders
Cert. No.
No. Shares
Cert. No.
No. Shares
L. S. Anderson
273
66.183
117
57.709
L. S. & L. P. Anderson
274
7.248
118
6.320
B. Bell & M. Bell
275
89.286
119
77.854
Kenneth Bell
276
.453
120
.395
Gypsy Blackstone
277
1.812
121
1.580
C. W. Bonynge & J. Bonynge
278
3.850
122
3.357
Leta Bonynge
279
3.850
123
3.357
R. M. Cordill
280
.453
124
.395
W. L. Davenport
281
23.103
125
20.145
W. L. Davenport
282
66.183
126
57.709
T. J. Evans
283
85.662
127
74.694
R. C. Goodspeed
284
93.136
128
81.212
G. M. Hart
285
.453
129
.395
Mary E. Johnson
286
2.265
130
1.975
Mrs. Alice E. Johnson
287
2.265
131
1.975
J. Knippenberg
288
.226
132
.197
Harry Schulz
289
4.530
133
3.950
L. R. Tuttle & M. I. Tuttle
290
1.585
134
1.382
C. P. Wright
291
.453
135
.395
Totals
453.   395.   *120 Common
Stockholders
Cert. No.
No. Shares
L. S. Anderson
129
41.784
L. S. & L. P. Anderson
130
4.576
B. Bell & M. Bell
131
56.370
Kenneth Bell
132
.286
Gypsy Blackstone
133
1.144
C. W. Bonynge & J. Bonynge
134
2.431
Leta Bonynge
135
2.431
R. M. Cordill
136
.286
W. L. Davenport
135
14.586
W. L. Davenport
138
41.784
T. J. Evans
139
54.082
R. C. Goodspeed
140
58.801
G. M. Hart
141
.286
Mary E. Johnson
142
1.430
Mrs. Alice E. Johnson
143
1.430
J. Knippenberg
144
.143
Harry Schulz
145
2.860
L. R. Tuttle & M. I. Tuttle
146
1.001
C. P. Wright
147
.286
Totals
286.   New Van Camp stock certificates were delivered on December 29, 1938, by Harris and Goodspeed to the Andersons, the Bells, Kenneth Bell, Blackstone, Evans, Goodspeed, and Knippenberg, and each person endorsed his certificates and returned them to Goodspeed to be delivered to the escrow agent for sale to the Phister group. The Van Camp stock represented by the above was about 75 percent of Van Camp stock which was re-issued to petitioner's stockholders in the liquidating distribution. Anderson received and endorsed as attorney-in-fact, under powers of attorney given to him, *121 the new Van Camp stock certificates issued to Cordill, Davenport, Hart, M. E. Johnson, Alice E. Johnson, Schulz, the Tuttles, and Wright. On December 29, 1938, separate escrow instructions to the Bank of America were executed by Goodspeed, Kenneth Bell, B. M. and M. K. Bell, Evans, and the Andersons, under which each signatory delivered to the escrow agent all of the Van Camp stock in his name and endorsed by him. On the same date Anderson, as attorney-in-fact, executed an escrow instruction for Blackstone, Cordill, Davenport, Hart, M. E. Johnson, Alice E. Johnson, Knippenberg, Schulz, the Tuttles, and Wright, under which he delivered to the escrow agent, duly endorsed, certificates for all of the Van Camp stock standing in their respective names. Also, on the same date, Anderson, as attorney-in-fact, executed a general escrow instruction for all of the former stockholders of petitioner, except the Bonynges, under which he delivered to the escrow agent the satisfactions and releases of all of the individuals of the defendants in the Anderson suit. The instruction stated that a dismissal of the Anderson suit and other papers had already been delivered to the escrow agent. *122 All of the escrow instructions directed the escrow agent to use the Van Camp stock and various papers so deposited in escrow upon the payment of cash in stated sums to all of the individuals whose Van Camp stock was delivered into escrow, and directed the escrow agent to deliver to the Goodspeed firm the dismissal agreement in the Mahar suit, and to pay to Henderson, trustee, for the account of all the persons whose Van Camp stock was placed in escrow stated balances of cash and promissory notes of Gilbert C. Van Camp and Roy P. Harper. On or before December 24, 1938, Mrs. Reynolds executed an escrow instruction and a supplementary instruction, under which she agreed to deliver the Van Camp stock standing in her name to the escrow agent to be used in the escrow and to be transferred to various individuals in the Phister group, upon delivery to the agent of a check in the amount of $67,920, and five promissory notes in the amount of $8,563 each. She also agreed to deliver a satisfaction and discharge against all of the individuals named in the Anderson suit. On December 30, 1938, the last date for closing in the escrow instructions of all of the prospective buyers and sellers, *123 a meeting was held at the Bank of America. Works and Phister, representing the buyers, and Mayock and Goodspeed, representing the sellers, and an agent of the bank, were present. It was stated at the beginning of the meeting that the Bonynges had not put into the escrow their Van Camp stock. That situation presented an obstacle to closing the escrow which persisted throughout the day. Phister suggested that the deal be completed if and when the Bonynge stock came in. Goodspeed would not acquiesce and threatened to call off the entire deal unless the Phister group purchased all of the stock then in the escrow. On December 30, the Bonynges had not executed a satisfaction and release of the defendants in the Anderson suit. It was very material to the Phister group and the Van Camp Company that releases be obtained from all of the persons represented by Anderson in the Anderson suit, because the complaint in that suit was based on continuance of the then management of the Van Camp Company. The Bonynges were represented by their own attorney named Hall and not by Goodspeed or Mayock. Late in the day of December 30, the attorney for the Phister group, Works, assured Phister that *124 the Bonynges would come into the transaction within the next few days. Without that assurance Phister would not have agreed to close on December 30. He agreed, finally, to close on the basis of purchasing all of the Van Camp stock in escrow on that date and the pertinent escrow instructions of the buyers were modified accordingly, and the escrow was closed. The escrow agent, thereupon, accepted on behalf of the buyers certificates of the Van Camp stock for an aggregate of 2,667.722 shares and paid to the vendors the consideration required in their instructions. Cashier's checks aggregating $40,880 were made to the order of the individual vendors, represented by Goodspeed. Also, a cashier's check for $38,842.26 was made payable to Henderson as trustee for said vendors as directed by them in their escrow instructions. Five promissory notes for $8,510 each, payable to Anderson and endorsed over to Henderson by Anderson, were delivered to Goodspeed, and he delivered them the next day to Henderson. On December 31, 1938, C. W. Bonynge and J. Bonynge and Leta Bonynge endorsed the Van Camp certificates for the various classes of stock issued to them in their names individually, and powers *125 of attorney to L. S. Anderson. He executed escrow instructions on their behalf, as their attorney-in-fact, and the stock was delivered thereafter, early in January of 1939, to the escrow agent. On December 31, 1938, Phister, Gillis, Grinnan, and the others, executed escrow instructions to cover the Bonynge stock. Subsequently, that escrow was closed $680and was paid to the Bonynges on January 5, 1939, $671.74 was paid to Henderson, trustee, for their account, and appropriate notations were made so that the Bonynges shared in the proceeds of the notes held by Henderson, as trustee, the Bonynges having executed the trust agreement. The Anderson suit was dismissed by order of the Superior Court. The agreement to dismiss the appeal in the Mahar case was not filed, but the District Court of Appeal entered decisions for the defendants on January 18, 1939, the reports of the cases appearing in 86 Pac. (2d) 383 and 384, sub nom Mahar v. Goodspeed. Henderson, as trustee and on behalf of the trust beneficiaries paid $10,250 out of cash paid to him by the escrow agent on account of legal fees for services rendered to petitioner. He made distributions *126 to the trust beneficiaries in 1939 aggregating $35,126.35. Prior to December 30, 1938, petitioner made a distribution in kind of 1,134 shares of Van Camp stock to its stockholders, pro rata, in complete liquidation. At the time of the distribution neither petitioner, nor its liquidating trustees, nor its stockholders, nor any one acting for petitioner or its stockholders were under any binding obligation to sell the Van Camp stock. No offer to purchase the stock had been made to petitioner, or its liquidating trustees, directly or indirectly. Petitioner's stockholders consented to petitioner's dissolution voluntarily. As individuals, the stockholders of petitioner executed powers of attorney, naming Anderson their attorney-in-fact, and authorizing him to sell for them the Van Camp stock which might be distributed to them upon liquidation of petitioner; and, voluntarily, they executed in duplicate originals a trust agreement appointing Henderson trustee of the proceeds payable to them from sale of Van Camp stock. On December 30, 1938, various individuals, for and on their own behalf, sold Van Camp stock owned by them by placing their stock in the escrow, and some of the sales *127 were made by some of the individuals acting directly, while others of the sales were made for some of the individuals by Anderson as their duly appointed attorney-in-fact. The sales were not made by the individuals for and on behalf of petitioner and petitioner did not realize any gain from the sales. Neither petitioner nor its liquidating trustees, nor any one on petitioner's behalf received any of the proceeds from the sales of the Van Camp stock by the individuals. Henderson received the proceeds from the sales of the Van Camp stock, as trustee, from individuals who were the former stockholders of petitioner, for their benefit, and he distributed to them the net proceeds and collections. The Commissioner determined that petitioner made a sale of its Van Camp stock and realized a profit of $120,933.50. He also allowed petitioner a deduction for attorney's fees in the amount of $13,007.56 which was not deducted by petitioner on its return. As a result of these determinations respondent found a deficiency of $17,202.70. The notice of deficiency was mailed to each petitioner in these proceedings on October 4, 1940. On January 17, 1941, Goodspeed transmitted to the collector at Reno, *128 Nevada, his check bearing that date in the amount of $18,870, representing payment under protest of $17,000 tax and $1,870 interest, which was received by the collector on January 20, 1941. The petitions in these proceedings were filed on December 30, 1940. Opinion The issue to be decided is whether the Van Camp stock which petitioner distributed to its stockholders was sold by them for their own account or was sold for petitioner for its account so that the sales constitute sales by petitioner for purposes of taxing the profit within the provisions of article 22 (a)-21 of Regulations 101. [3]
*129 Petitioner contends that the Van Camp stock was distributed to its stockholders as a liquidating distribution in kind and that thereby the distributees became the owners of the stock, re-issued to them in their own names, as it was intended and as the corporate records and other documents show, and that the sales made on December 30, 1938, were made by the various individuals as owners of the Van Camp stock in their own right, and that the profit is taxable to the individuals and not to petitioner. It relies upon Falcon Company, 41 B.T.A. 1128, affd., 127 Fed. (2d) 277. Respondent contends that the facts should be construed to show that petitioner, in effect, transferred the Van Camp stock to a liquidating trustee, Henderson, who acted for it as well as petitioner's stockholders; that the sales on December 30, 1938, were in liquidation of petitioner's property; and that the proceeds were to be used, first, to satisfy petitioner's obligations, the balance only being distributable to petitioner's stockholders. This is a fair summary of respondent's interpretation of the facts upon reviewing the authorities upon which respondent *130 relies, because the above is the type of situation dealt with in most of the cases cited by respondent within the rule of which respondent believes this case falls. Respondent relies chiefly upon the following cases: Paraffine Oil Company, 28 B.T.A. 207; Liberty Service Corporation, 28 B.T.A. 1067; affd., 77 Fed. (2d) 94; Taylor Oil & Gas Co. v. Commissioner, 47 Fed. (2d) 108, certiorari denied, 283 U.S. 862; Burnet v. Lexington Ice & Coal Co., 62 Fed. (2d) 906; Hellebush v. Commissioner, 65 Fed. (2d) 902; Northwest Utilities Securities Corporation v. Helvering, 67 Fed. (2d) 619, certiorari denied, 291 U.S. 684. In order to bring this case within the rule of the above line of cases, in which the type of situation in each case was similar, respondent argues that no weight is to be given to certain steps which were taken in the instant case. The facts have been set forth at great length and the issue to be decided *131 turns upon the facts. Because the facts in this case differ in many respects from the facts in the cases relied upon by the respondent, it is necessary to discuss the facts. Whether a corporation or its stockholders is taxable on gain realized from a sale of property under circumstances where there is a distribution to the stockholders in close proximity, in point of time, to the disposition of the property, thereafter, depends upon the facts. It is a question of fact whether the sale is made by the corporation or by the stockholders. Where it is claimed that the sale is by the stockholders, the distributees, the facts which are determinative are of the following kind: (a) Title to the property must actually be in the distributees. (b) The sale of the property must be by the distributees after title to the property has vested in them, and the corporation cannot have become a party to a binding contract of sale of the property prior to the distribution thereof. (c) Weight must be given to the use of the proceeds from the sale depending upon whether the distributees or the corporation receives the consideration. (d) The facts must be examined to show whether or not the distributees *132 were merely acting as agents of the corporation. The bona fides of the transaction must be scrutinized. If the distributees are legally obligated to complete a bargain begun by the corporation, they are acting merely as the corporation's agents. If not, and if they are free to choose between making a sale, or not, then they are acting for themselves. Chisholm v. Commissioner, 79 Fed. (2d) 14, certiorari denied, 296 U.S. 641. In this proceeding respondent urges that much weight should be given to the fact that prior to the distribution of the stock, a purchaser had been found, the prices had been agreed to by Goodspeed and Mrs. Reynolds, and petitioner's stockholders had indicated their willingness to sell the Van Camp stock, after distribution, at the agreed prices by executing powers of attorney and the trust agreement. Such facts, and others, the respondent contends, indicate that the stockholders of petitioner did not exercise any independent judgment and that they did not have dominion and control over the Van Camp stock which was distributed by petitioner. Petitioner relies on the Falcon case, supra, and *133 the facts there were not very different from those here. There were four stockholders of Falcon Company. There had been conversations between one of its officers and Tide Water Oil Company relating to a possible purchase of interests in oil leases owned by Falcon, and Tide Water had offered Falcon a stipulated amount for certain interests. Falcon had an agreement with East Texas Refining Co., and Bass & Dillard under the terms of which if any one party received an offer from outsiders to purchase property, such offer should be submitted to the others and they were to have the option to purchase the interest of the party receiving the offer. Falcon decided not to sell to Tide Water or anyone else, because of the tax which would be incident to the sale, and, also, Falcon's stockholders decided that Falcon should distribute the oil interests which were the object of the offer to them in partial liquidation. The distribution was made upon surrender of 60 percent of Falcon's stock to it. On the same day of the distribution, East Texas made an offer to Falcon's stockholders, the distributees, to purchase from them the property they had received from Falcon for the same consideration, or *134 approximately the same, that Tide Water had offered. The stockholders of Falcon accepted the offer, the sale was made, and the consideration was received by Falcon's stockholders only. It was held that the sale was not made by Falcon and that it was not taxable on the gain. The Circuit Court, in its opinion affirming the Board of Tax Appeals, viewed the facts as showing that the conveyance of the leasehold interests by Falcon was bona fide and unconditional and that after the stockholders acquired the property in their own right, they negotiated for the sale of their interests voluntarly and without prior obligation, as they had a right to do. Here, the facts are as follows: The Phister group desired to obtain Van Camp stock owned by Mrs. Reynolds, petitioner, and five individuals who were, also, petitioner's stockholders. Goodspeed, one of the five, and the largest stockholder in petitioner, would not agree to a sale by petitioner of its block of Van Camp stock. He undertook to tell the Phister group that insofar as his consent to a settlement of the Anderson case was concerned (and his consent was a prerequisite, because the Phister group required releases and discharges *135 from all persons represented by Anderson in the Anderson suit), they must either purchase the outstanding stock of petitioner or purchase from petitioner's stockholders the Van Camp stock which they would receive from a liquidating distribution from petitioner. Goodspeed realized that petitioner's stockholders would receive petitioner's assets subject to petitioner's debts and that the Phister group would purchase on an installment plan giving notes payable for about half the purchase price over five years. Some of petitioner's stockholders resided outside of California and others were scattered about the state. Goodspeed believed that the stockholders, if they desired to sell their Van Camp stock after distribution, could proceed to do that within the short time remaining in 1938 by giving to one person powers of attorney to act for them in making the sales, and he believed that the collection of the notes of the buyers for the many sellers could best be done by a trustee for the sellers, who could, also, make each stockholder's pro rata payment of each stockholder's liability to pay the debt of petitioner for attorneys' costs and fees, and any taxes due by petitioner for the *136 year 1938. Goodspeed was not an officer or director of petitioner. His firm acted as counsel for petitioner. However, the record provides ample grounds for concluding, reasonably, that Goodspeed acted throughout primarily in his individual capacity as a stockholder of petitioner, insofar as he made suggestions to the Phister group. He had strong ideas of his own of time limits, procedures, and so forth. He suggested, so it appears that everything could be done on or before certain dates. The Phister group and their attorney, Works, knew that if any transaction was consummated, it would be with petitioner's stockholders and not with petitioner. Goodspeed wrote to each stockholder on December 16th giving a perfectly clear statement of the situation and his letter certainly left it entirely open to the individuals to whom he wrote to decide whether or not to consent to the dissolution of petitioner, to sell Van Camp stock to be distributed to them on dissolution, and to enter into a trust agreement with each other. All the terms of the Phister offer were clearly set forth and all the terms of the power of attorney and trust were clear, the documents covering the latter being enclosed *137 for the individuals to read and to sign, if they wished. Petitioner's stockholders, residing in various places, necessarily acted individually and without knowledge of what the others would do when each one, upon receiving Goodspeed's letter, decided to execute the trust agreement and a power of attorney. The trust agreement was not to become operative unless 9/10ths of petitioner's stockholders agreed to the trust. But, this does not, in our opinion, mean that the individuals concerned were under any compulsion. They were free to reject Goodspeed's plan as well as the Phister group's proposal. Reading together the escrow instructions of the Phister group and Goodspeed's letter to petitioner's stockholders, we find that Goodspeed asked the individuals to indicate their decision on or before December 24, 1938, and the Phister group advised the escrow agent that they would place everything in escrow on or before December 24, 1938. On or before December 24, 1938, owners of 1,956 shares of petitioner's stock had indicated that they would sell at a future time Van Camp stock to be distributed to them. From this it may be concluded that the Phister group in reality made their offer direct *138 to the persons who were petitioner's stockholders, having made the last date upon which to put their consideration into the escrow, the date when it would be known whether or not petitioner's stockholders were agreeable to the proposed transaction. Petitioner was dissolved and the Van Camp stock was re-issued to petitioner's stockholders by the Van Camp Company. At the time of the distribution petitioner had not entered into any contract to sell the Van Camp stock. No sale of the stock was made by anyone until after the distribution. All that the Phister group had done prior to petitioner's dissolution was to make an offer to petitioner's stockholders to purchase Van Camp stock from them. Until it was accepted, the Phister group could have withdrawn their offer. All that some of the stockholders of petitioner had done was to give powers of attorney to act for them, individually, in selling their respective shares of Van Camp stock. They were free to withdraw the powers of attorney. Any one of the powers of attorney would have been revoked, in effect, by the death of any grantor thereof prior to its exercise. The powers of attorney had no binding effect until they were used, which *139 was not until December 30, 1938. Todd v. Superior Court, 181 Cal. 406; 184 Pac. 684. The giving of the powers of attorney did not mean that they would be used. As it transpired, later, some of petitioner's stockholders who executed the powers of attorney did not make use of them, to wit, Kenneth Bell, the Bells, and Evans. Also, until sales of the Van Camp stock were made, and only in the event that such sales were made by 9/10ths of petitioner's former stockholders, could the trust agreement become operative. Under the terms of the trust agreement, the grantors of the trust assigned to Henderson, as trustee, the proceeds of the liquidating distribution "after and subject to exercise of power of attorney" granted to Anderson, etc. Accordingly, it must be concluded that none of petitioner's stockholders had become legally bound to make sales of the Van Camp stock at any time prior to petitioner's dissolution. Also, obviously, the execution of the trust agreement and of the powers of attorney did not constitute the acceptance of the offer of the Phister group or any agreement on the part of all of petitioner's stockholders to *140 sell the Van Camp stock upon the distribution thereof. When petitioner made the liquidating distribution of the Van Camp stock, each distributee was free to retain the stock, was free not to sell to the Phister group. As the matter stood on December 29, 1938, the offer of the Phister group had not been accepted, and, although it appears at that time the Phister group intended to buy the Van Camp stock and the individual distributees, except the Bonynges, intended to sell their respective shares, there remained still the interval within which everyone could have changed their minds. See Estate of C. William Meinecke, 47 B.T.A. 634, 639. On December 30, 1938, individuals who had received over 75 per cent of the Van Camp stock endorsed the certificates themselves and executed escrow instructions themselves. They sold their stock directly and not under the powers of attorney which they had executed to Anderson; that is, individuals owning 856.031 shares of the reissued Van Camp stock, acting for themselves, sold that stock to the Phister group on December 30, 1938. Others, owning 258.693 shares of the reissued Van Camp stock sold their stock on December *141 30, 1938, through Anderson, their attorney-in-fact, who was not an officer or director of petitioner. The Bonynges owning 19.276 shares of the Van Camp stock did not sell their stock on December 30, 1938. They did so later, however. Under the above facts, it is concluded that certain former stockholders of petitioner, acting in their own right, voluntarily and without any obligation having been imposed upon them by petitioner, sold Van Camp stock to which they had title on December 30, 1938. It is not material that they consented to petitioner's dissolution in anticipation of their selling the property thereafter, which they would receive upon dissolution. It certainly was in the minds of the four stockholders of the Falcon Company that they anticipated selling the property they would receive in partial liquidation of Falcon at the time they consented to the partial liquidation. On this point the facts here do not take this case outside the rule of the Falcon case. The former stockholders of petitioner made bona fide and unconditional sales of their Van Camp stock and they received from the escrow agent, directly, at the time of the sale, cash aggregating $40,880 which *142 they retained, individually. They directed the escrow agent to pay $38,842.26 out of the cash proceeds from the sales of their Van Camp stock to Henderson, their trustee. The only debt of petitioner, with the possible exception of income tax, was on account of legal fees, and this was an obligation of petitioner which the former stockholders had assumed, for it was understood at the time the distribution in liquidation of petitioner was made that the debt would be paid by them, as the minutes of the meeting of the liquidating trustees on December 28, 1938, show, and as the terms of the trust agreement show. The balance of the attorney's fees unpaid on December 31, 1938, was at the most $13,007.56, (petitioner's exhibit 14). Henderson paid that amount out of the funds of the trust in his hands. It is pointed out that petitioner's former stockholders did not transfer to their trustee all of the proceeds of their sales and that nothing was transferred to the trustee until after the sales had been consummated. The facts do not support a conclusion that petitioner transferred any property to Henderson in any capacity. Respondent argues that petitioner had a continued existence, de facto, *143 and that Henderson was acting as its liquidating trustee, rather than as a trustee for the former stockholders, because of the existence of unpaid liabilities. Under all of the circumstances, respondent takes the view that since petitioner's debts were not paid prior to the liquidating distribution, the Van Camp stock remained vested in petitioner after the dissolution, through a "liquidating trustee." In our opinion this phase of the situation does not militate against petitioner. Under ordinary circumstances there is no impediment to a corporation's selling or distributing its assets to others in consideration for their assuming the corporation's liabilities. It is a question of fact of what is done. The existence of debts does not prevent or defer the vesting of title to assets distributed to stockholders. This was pointed out in Snead v. Elmore, 59 Fed. (2d) 312, 315: Stockholders actually receiving the assets of their corporation on its dissolution in virtue of their stock are held to receive a present liquidating dividend though they may not pay the corporate debts and fully minister the assets until later. Here the stockholders actually *144 received petitioner's assets on its dissolution. They received the assets unconditionally. A corporation may distribute its assets in complete liquidation without first paying all of its debts. Everything considered, we cannot say that petitioner's stockholders did not actually receive petitioner's assets for their stock, and it is clear that they assumed petitioner's unpaid obligations. Accordingly, we reject respondent's argument that the way in which petitioner's obligations were paid is proof that there was a retention by petitioner of its assets through a liquidating trustee. Henderson, as the duly appointed trustee of the former stockholders, acted for them, solely, in discharging their assumed obligations. It is held that petitioner was under no legal obligation to sell its Van Camp stock; that petitioner distributed its assets to its stockholders who acquired title thereto, and that the distribution to them was bona fide, absolute and unconditional; that there were no sales contracts in existence at the time of the distribution in liquidation; that the former stockholders of petitioner sold in their own right the Van Camp stock distributed to them after they acquired *145 it, voluntarily and without the compulsion of any prior obligation of petitioner upon them so to do; and that the former stockholders of petitioner received the proceeds of the sales separately and individually notwithstanding their assignment of part of the consideration paid by the buyers to a trustee appointed by them. This proceeding comes within the rule of the Falcon case, and petitioner is sustained. See also, Grand Rapids Trust Co. et al, Administrators, 34 B.T.A. 170. Decisions in each of the proceedings will be entered under Rule 50 for the reason that petitioner has not contested one adjustment, an addition to income for "costs recovered" in the amount of $856.50. The record shows (Petitioner's exhibit 7), that petitioner was the owner of two judgments for court costs in the Mahar case and that petitioner's attorneys gave petitioner credit for that amount on petitioner's account with that law firm for legal fees in connection with the Mahar and Anderson suits. Whether or not the addition of this amount to petitioner's income results in a small deficiency should be made clear in a recomputation under Rule 50. Also, the *146 decision in Docket No. 106029, Richard C. Goodspeed, petitioner will show that he paid $18,870 after the mailing of the notice of deficiency to him, (Section 322 (d), Revenue Act of 1938). Decision will be entered under Rule 50.
Footnotes
*. The Commissioner has determined transferee liability against some of the former stockholders of the Harbor Holding Company, as transferees of its assets, and the petitions of the alleged transferees have been consolidated with this proceeding as follows: W. L. Davenport, #106027; Richard C. Goodspeed, #106029; Estate of T. J. Evans, Deceased, Mollie Blackstone Knippenberg, Executrix, #106030; and L. S. Anderson, #106031. The Commissioner has determined that each of the above petitioners, except L. S. Anderson, is individually liable as a transferee for the full amount of the deficiency of the Harbor Holding Company in the amount of $17,202.70. The Commissioner has determined that the transferee liability of L. S. Anderson, #106031, is $14,277.55.↩
1. In determining the deficiency, the respondent fixed the amount of the alleged gain from the sale of certain property as $120,933. At the hearing counsel for respondent agreed that the gain was not more than $120,923, or, $10 less than originally determined.↩
2. When petitioner had been a party defendant in the Mahar case, a contract had been made for sharing the expense of defending that suit and petitioner, in 1938, was still obligated to pay certain expenses in connection with the Mahar suit, even though it was no longer a defendant. Also, in the Anderson suit, as Anderson brought the suit in a representative capacity only, he could not personally pay the costs. It had been agreed that one half of the costs of the Anderson ↩ suit would be paid by Mrs. Reynolds and one half would be paid by the petitioner.
3. ART. 22 (a) - 21. GROSS INCOME OF CORPORATION IN LIQUIDATION. - When a corporation is dissolved, its affairs are usually wound up by a receiver or trustees in dissolution. The corporate existence is continued for the purpose of liquidating the assets and paying the debts, and such receiver or trustees stand in the stead of the corporation for such purposes. (See sections 274 and 298). Any sales of property by them are to be treated as if made by the corporation for the purpose of ascertaining the gain or loss. No gain or loss is realized by a corporation from the mere distribution of its assets in kind in partial or complete liquidation, however they may have appreciated or depreciated in value since their acquisition. But see section 44 (d) and article 44-5. (See further article 52-2.)↩